**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

---

| | |
|---|---|
| NATHAN WALKER | CIVIL ACTION NO. 23-740 |
| VERSUS | JUDGE DONALD E. WALTER |
| UNION PACIFIC RAILROAD CO. | MAG. JUDGE KAYLA D. MCCLUSKY |

---

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment filed by Defendant, Union Pacific Railroad Company ("Union Pacific"), seeking to dismiss all claims with prejudice. See Record Document 38. Plaintiff, Nathan Walker ("Walker"), filed an opposition, and Union Pacific replied. See Record Documents 43 and 44. For the reasons assigned herein, Union Pacific's motion for summary judgment is **DENIED.**

**BACKGROUND**

On March 19, 2022, Walker was working as a conductor in Union Pacific's Hollywood Yard ("the Yard") in Shreveport, Louisiana. See Record Document 43-3 at 2. While working in the Yard that night, Walker testified he was kneeling at a derail switch sign and attempting to take off the locks of the derail switch[1] when he heard gunshots in the vicinity of his worksite. See Record Document 38-3 at 17. To protect himself, Walker claims he took immediate cover behind a wheel on the right side of the locomotive situated approximately ten yards behind him, placing himself in a position where the train separated him from the road. See id. at 20. Therefore, at the time of the alleged gunshots, Walker admits he did not see the perpetrator because he was kneeling at the derail switch sign and immediately sought shelter after hearing the shots. See id. at 21–22.

---

[1] A derail switch is a safety device which derails rolling stock in a rail yard to prevent collisions.

However, Walker testified he believes that the gunshots came from the vehicle he noticed approaching the Yard when he was walking towards the derail switch. See id. at 21. James Ezernack ("Ezernack") was working with Walker that night and testified he also "heard several gunshots that were close by" but couldn't see where they were coming from. Record Document 43-6 at 7.

Walker and Ezernack immediately reported the alleged gunshots to yardmaster Wayne Haughton ("Haughton") over the locomotive radio. See Record Document 38-3 at 24. Haughton instructed the two to continue taking the engine to the roundhouse and finish their work that night. See id. at 25. Walker took the engine to the roundhouse and then told Ezernack that he was too frightened to continue working and left. See id. Haughton reported the incident to the senior manager of train operations, Sam Embras ("Embras"), and filed an incident report through Union Pacific's Response Management Communication Center ("RMCC") Incident Management System. See Record Documents 38-6 at 8 and 38-7 at 1. Haughton also notified the local sheriff's department and the Shreveport Police Department. See Record Document 38-6 at 8.

Embras and Special Agent Quincy Bryant ("Bryant") spoke with Walker and Ezernack and investigated the scene. See id. In the supplemental police report created by Bryant, Embras reported to Bryant that Walker "is known to often try to avoid doing work" and "complained to his coworkers about having to switch a block . . . ." Record Document 43-8 at 10. Bullet holes were found on the alleged derail switch sign. See Record Documents 43-4 at 10 and 43-7 at 2. The locomotive that Walker was near was equipped with a security camera which captured the event. See Record Document 38-5. The security camera recorded a noise of what appears to be three consecutive shots coming from a distance. See id. However, the security camera footage did not capture a perpetrator or the exact source of the alleged shooting. See id. Additionally, Embras

2

testified he investigated the area that Walker described and did not find any shell casings. See Record Document 38-6 at 5, 10–11.

As a result of the incident, and despite Embras's skepticism, Walker was given an initial three days off work. See Record Document 43-5 at 86. On March 22, 2022, Walker contacted Union Pacific's Employee Assistance Program ("EAP"), seeking medical leave due to anxiety from the incident. See Record Document 38-3 at 27. Three days later, EAP approved Walker's request for a medical leave of absence. Union Pacific's Employee Assistance Manager, Thomas Reimers ("Reimers"), emailed Walker and provided him with instructions regarding Union Pacific's reporting requirements for a medical leave of absence. See Record Document 38-8 at 2–7. The email sent to Walker stated that it was Walker's responsibility to submit documentation from his provider to secure medical leave, extend medical leave, or return to work. See id. at 2. The email further stated, "To secure your initial medical leave (or any length of time for more or less than 30 days), your provider must submit to EAP the documentation that is listed below." Id. at 3. Additionally, the email advised Walker that the failure to provide documentation to extend his medical leave could result in his leave being revoked or going into a show cause process. See id. at 4. The email explained that the show cause process could lead to an investigation for Walker being considered absent without official leave ("AWOL"). See id. During this time, Walker also reported the incident to Union Pacific's safety hotline and spoke to Union Pacific's General Chairman, Scott Chelette ("Chelette"), about the incident. See Record Document 43-5 at 86.

Because EAP approved Walker's request for a medical leave of absence, he received counseling from a licensed professional counselor, Jerry Franklin ("Franklin"), who diagnosed Walker with post-traumatic stress disorder. See Record Documents 43-3 at 3 and 43-10 at 3. On April 11, 2022, Reimers emailed Walker to remind him that the deadline to submit the required

paperwork was April 24, 2022. See Record Document 38-8 at 8 ("Make sure and have your [counselor] send in documentation that you have been seen twice to secure and extend your medical leave."). That same day, Walker requested Franklin submit the paperwork before the deadline and indicated that he desired to participate in the "borrow out" and move to another service unit. Record Document 43-11 at 2. However, Walker injured his arm while moving furniture and asked Franklin to delay submitting the documents until late Sunday, before the deadline. See id. at 5. Ultimately, neither Walker nor his counselor timely submitted the required documents. Additionally, Union Pacific never requested any documentation from Franklin. See Record Document 43-18 at 1. Despite the failure to timely file the required documents, EAP granted Walker a grace extension of his medical leave of absence. See Record Document 38-12 at 4.

On May 14, 2022, Walker was flagged in the EAP system for revocation of leave. See Record Document 38-13 at 1–2. On May 16, 2022, Chelette sent an email to Union Pacific's Manager of Safety and Reporting, Zac Tegeder ("Tegeder"), stating, "Not sure where the disconnect is but this employee is on medical leave of absence in HP status.[2] Mr. Walker needs to be marked up at once." Record Document 38-8 at 13. That same day, Tegeder confirmed that Walker's required medical documents were not submitted, revoked Walker's medical leave, placed him into AWOL status, and sent a termination letter to Walker for failure to protect employment. See Record Document 38-13 at 2, 5. On May 21, 2022, Walker attempted to cure the deficiency and submit his medical documents; however, Union Pacific rejected the documents as illegible. See Record Document 38-8 at 10–12.

---

[2] HP status indicates that the employee is physically unable to work. See Record Document 43-5 at 90.

4

On May 23, 2022, Walker's counselor submitted his medical paperwork to the EAP, resulting in Union Pacific's removal of AWOL status and revocation of his termination. See Record Documents 43-10 at 2 and 43-12 at 4. That same day, Walker spoke to Reimers and stated that he wanted to return to work, and Reimers informed him that his return to work depended on the paperwork from his counselor and his ability to be safe at work. See Record Document 43-12 at 4. In every progress note provided by Franklin to Reimer, Walker's estimated return to work date was "[i]mmediately." Record Document 43-10 at 2, 4, 6, 9, 13. Neither Walker nor Franklin requested an extension of Walker's medical leave of absence past May of 2022. However, EAP extended Walker's medical leave of absence until October of 2022. See Record Document 43-12 at 3–4. As a result, Walker was on unpaid leave from May until October of 2022.

On August 17, 2022, Walker filed a complaint with the Occupational Safety Health Administration ("OSHA"). See Record Document 44-4. On March 22, 2023,[3] Walker filed suit, asserting two causes of action. See Record Document 1. Walker asserts Union Pacific violated the provisions of the Federal Employer's Liability Act ("FELA") by negligently and carelessly failing to provide him with a reasonably safe place to work which caused and/or contributed to serious mental injuries that he sustained as a result of a shooting on the night of March 19, 2022. See id. at 6. Additionally, Walker alleges two separate retaliatory adverse actions under the Federal Railroad Safety Act ("FRSA"): (1) Union Pacific terminated Walker's employment soon after he made multiple reports about the gunshot incident and refused to work in the hazardous safety or

---

[3] No decision was made by OSHA, and Walker received a right to sue letter on March 23, 2023. Although Walker received his right to sue letter after filing suit, courts within the Fifth Circuit have held that "'receipt of a right-to-sue letter subsequent to the commencement of a Title VII action, but while the action remains pending' cures the initial failure to exhaust administrative remedies." Hilliard v. Par., 991 F. Supp. 2d 769, 773 (E.D. La. 2014) (quoting Pinkard v. Pullman-Standard, a Div. of Pullman, Inc., 678 F.2d 1211, 1219 (5th Cir. 1982)).

5

security conditions at the Hollywood Yard, and (2) Union Pacific refused to allow Walker to return to work for several months after reversing its termination of his employment and unilaterally extending his unpaid medical leave of absence from May of 2022 to October of 2022. See Record Document 43-1 at 27.

On March 29, 2024, Union Pacific filed its motion for summary judgment. See Record Document 38. As to Walker's FELA claim, Union Pacific argues that Walker's emotional distress claim is not legally and factually cognizable because he was "well outside the zone of danger." Record Document 38 at 5, 10. Likewise, Union Pacific rejects Walker's FRSA claims, denying any nexus between his termination and the incident and further arguing that Walker's failure to provide Union Pacific with medical paperwork properly led to his discharge. See id. at 5.

## LAW AND ANALYSIS

### A. Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. See id. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact by pointing out that the record contains

6

no support for the non-moving party's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (quoting Fed. R. Civ. P. 56(c)).

**B. FELA Standard.**

Union Pacific moves for summary judgement as to Walker's negligence claim under FELA. See Record Document 38-1 at 10. "FELA provides the exclusive remedy for a railroad employee injured as a result of his employer's negligence." Rivera v. Union Pac. R. Co., 378 F.3d 502, 507 (5th Cir. 2004). Pursuant to FELA, "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier. . . ." 45 U.S.C. § 51. To prevail on a FELA claim, "a plaintiff must prove: (1) the defendant is a common carrier by railroad engaged in interstate commerce; (2) he was employed by the defendant with duties advancing such commerce; (3) his injuries were sustained while he was so employed; and (4) his injuries resulted from the defendant's negligence." Weaver v. Mo. Pac. R. Co., 152 F.3d 427, 429 (5th Cir. 1998).

The Court notes that "the rules of the summary judgment game are different when the nonmoving party is a FELA plaintiff." Kan. City S. Ry. Co. v. Nichols Const. Co., 574 F. Supp. 2d 590, 594 (E.D. La. 2008). In a FELA case, the plaintiff's burden of proof is "featherweight," and Fifth Circuit precedent clearly establishes that judgment against the plaintiff "is appropriate 'only when there is a complete absence of probative facts' supporting the plaintiff's position." Howard v. Canadian Nat'l/Illinois Cent. R.R., 233 F. App'x 356, 357 (5th Cir. 2007) (quoting Rivera, 378 F.3d at 506). The Fifth Circuit recognized that the "congressional intent in enacting the FELA was to secure jury determinations in a larger portion of cases than would be true of ordinary common law actions" and that a "trial by jury is part of the remedy in FELA cases." Id.

Walker seeks to recover for his emotional injuries. See Record Document 1 at 7. To recover for an emotional injury under FELA, the Court must apply the zone of danger test. See Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 555, 114 S. Ct. 2396, 2410 (1994). Under this test, a worker must be within the zone of danger of physical impact "to recover for emotional injury caused by fear of physical injury to himself, whereas a worker outside the zone will not." Id. at 556, 114 S. Ct. at 2410–11. "Railroad employees thus will be able to recover for injuries—physical and emotional—caused by the negligent conduct of their employers that threatens them imminently with physical impact." Id. "Whether a plaintiff is at immediate risk includes both objective and subjective components; the plaintiff must objectively be within a zone of danger and subjectively fear at the time of the incident that his life or person was in danger." In re Deepwater Horizon, 841 F. App'x 675, 679 (5th Cir. 2021) (quoting Anselmi v. Penrod Drilling Corp., 813 F. Supp. 436, 442 (E.D. La. 1993)).

Union Pacific argues that Walker was not objectively within a zone of danger. See Record Document 38-1 at 11. For a plaintiff to be objectively within the zone of danger, the Fifth Circuit requires "that the plaintiff must be in the same location as the accident and face immediate risk of harm." Id. To support that he was objectively under threat of immediate physical harm at the time of the alleged shooting, Walker and Ezernack testified that they heard several gunshots that were close by to where they were located. See Record Documents 38-3 at 17 and 43-6 at 7. Additionally, the locomotive's security camera recorded a noise that sounds similar to three consecutive gunshots, and bullet holes were found on the derail switch sign. See Record Documents 38-5, 43-4 at 10, and 43-7 at 2. Conversely, Union Pacific contends that the security camera footage did not capture a perpetrator or the exact source of the alleged shooting and that no shell casings were found around the area that Walker described. See Record Documents 38-5 and 38-6 at 10–11.

Therefore, Union Pacific asserts there is no evidence that the shots even entered the railyard and Walker cannot show he was objectively within the zone of danger. See Record Document 38-1 at 12–13.

Union Pacific relies on In re Deepwater Horizon and Barker to support its argument. See In re Deepwater Horizon, 841 F. App'x 675 (5th Cir. 2021); Barker v. Hercules Offshore, Inc., 713 F.3d 208 (5th Cir. 2013). In In re Deepwater Horizon, the plaintiffs were about fifteen miles away from an offshore drilling rig when it exploded. See id. at 677. Shortly after the explosion, the plaintiffs responded to a distress call from the rig on their radio. See id. While searching for people in the water, "flames from the rig jumped as high as 500 feet in the air and subsequent explosions occurred on the burning rig every few minutes[.]" Id. The plaintiffs kept 100 to 200 feet away from the burning rig but "believed they were under constant threat of another massive explosion that would send debris towards them and their boat[.]" Id. The plaintiffs also "felt and heard deep rumbling sounds coming from deep below the surface of the water, which shook their boat and caused them to believe that they were at immediate risk of harm." Id. (internal quotations omitted). In applying the zone of danger test, the Fifth Circuit held that the objective prong of the zone of danger test was not satisfied because the plaintiffs were 100 to 200 feet away from the site of the explosions and the feeling of deep rumbling sounds in the water did not place the plaintiffs "at the site of the accident and subsequent explosions." See id. at 679.

In Barker, the plaintiff, an offshore welder, was working on a jack-up drilling rig when a pollution pan fell 100 feet into the ocean. See Barker, 713 F.3d at 211. When the incident occurred, the plaintiff was standing about two feet from the pan with his back turned. See id. at 212. The Fifth Circuit applied the zone of danger test and held that there was no recovery for plaintiff. See id. at 224. Although the plaintiff was two feet from the incident site, the plaintiff testified that he

was standing on solid ground which was not going to fall, and when the incident occurred, the plaintiff was "out of the dangerous position where something could have happened . . . if the pan had been cut." Id. Additionally, the court noted that the plaintiff further testified that his initial reaction to the sound of incident was not that he was scared that he was going to fall. See id. at 224–25. Rather, the plaintiff was concerned about the safety of his co-workers. See id.

The facts of this case are distinguishable from both Fifth Circuit precedents. Even though the plaintiff in Barker was only two feet away from the incident, the Fifth Circuit noted that the plaintiff was on solid ground which was not going to fall. See Barker, 713 F.3d at 224. The facts of that case made the stability—rather than proximity—of the plaintiff's location more relevant because the incident involved a pan falling into the ocean. See id. Here, the proximity of the plaintiff's location to the incident is relevant. Walker testified that he was kneeling at a derail switch sign and attempting to take off the locks of the derail switch when he heard gunshots. See Record Document 38-3 at 17. There is evidence of bullet holes in the derail switch sign that Walker testified he was working nearby. See Record Document 43-7 at 2. Although Walker cannot confirm whether the bullet holes in the derail switch sign existed prior to the events of March 19, 2022, Union Pacific cannot deny that allegation either. See Record Documents 43-5 at 53–54 and 43-13 at 38. If the alleged gunshot sound from the video was a bullet that struck the derail switch sign, then Walker was undoubtedly within the zone of danger. The location of the accident would have been only a few feet away from Walker's head—not 100 to 200 feet away. See In re Deepwater Horizon, 841 F. App'x at 679. After a careful consideration of the record, this Court finds that there is not a complete absence of probative facts to support Walker's position. The evidence of the bullet holes in the derail switch sign combined with the testimony of Walker and Ezernack is enough to satisfy Walker's featherweight burden for summary judgment purposes. For

these reasons, Union Pacific's motion for summary judgment is **DENIED** to the extent that it seeks dismissal of Walker's FELA claim.

**C. Walker's FRSA Claim.**

Union Pacific also moves for summary judgment as to Walker's retaliation and wrongful termination claim under the FRSA. The FRSA focuses on promoting safety in the railroad industry. See 49 U.S.C. § 20101. Congress amended the FRSA to create stronger protections for employees who engage in whistleblower activities such as preventing railroad carriers from discriminating or retaliating against an employee who engages in a protected activity. See Yowell v. Admin. Rev. Bd., United States Dep't of Lab., 993 F.3d 418, 421 (5th Cir. 2021) (internal citations omitted). Railroad carriers "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done. . . ." 49 U.S.C. § 20109(a). The relevant protected activities central in this case are notifying the railroad carrier of a work-related personal injury[4], reporting hazardous safety or security conditions[5], and refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties.[6] Walker engaged in protected activities when he reported the gunshot incident to Haughton, spoke to the Union Pacific Railroad police officers, requested a medical leave of absence in connection with the incident, and reported the incident to Union Pacific's safety hotline.

"An action brought to enforce these protections 'shall be governed by the legal burdens of proof set forth in [49 U.S.C. §] 42121(b)." Yowell, 993 F.3d at 421 (quoting 49 U.S.C. §

---

[4] See 49 U.S.C. § 20109(a)(4).
[5] See 49 U.S.C. § 20109(b)(1)(A).
[6] See 49 U.S.C. § 20109(b)(1)(B).

11

20109(d)(2)(A)(i)). This burden-shifting standard first requires the plaintiff establish by a preponderance of the evidence: (1) he was involved in a protected activity; (2) the employer was aware that the employee was involved in a protected activity; (3) the employee was subjected to an unfavorable employment action; and (4) the protected activity was a "contributing factor" in that unfavorable employment action. Id. at 421–22. If the plaintiff establishes this prima facie showing, the burden then shifts to the employer to prove by clear and convincing evidence that it would have taken the same unfavorable employment action in the absence of the employee's protected activity. See id. at 422 (citing 49 U.S.C. § 42121(b)(2)(B)(iv)). The Fifth Circuit has not yet addressed whether the plaintiff in an FRSA claim must show intentional retaliation or discriminatory motive nor have other circuits established a conclusive rule. See id. at 425 (citing Epple v. BNSF Ry. Co., 785 F. App'x 219, 221–22 (5th Cir. 2019)).

Walker alleges two separate retaliatory adverse actions: (1) Union Pacific terminated Walker's employment soon after he made multiple reports about the gunshot incident and refused to work in the hazardous safety or security conditions at the Hollywood Yard, and (2) Union Pacific refused to allow Walker to return to work for several months after reversing its termination of his employment and unilaterally extending his unpaid medical leave of absence from May of 2022 to October of 2022. See Record Document 43-1 at 27. Each will be addressed in turn.

**1. Termination of Walker's Employment.**

The parties here do not dispute that Walker engaged in the protected activity of reporting the incident, Union Pacific was aware of such activity, and that Union Pacific terminated Walker's employment. The only dispute is whether Walker's protected activity was a contributing factor in the unfavorable personnel action.

The Fifth Circuit defines a "contributing factor" as "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the [employer's] decision." Yowell, 993 F.3d at 422. "'[E]ven the slightest' influence from the protected activity will invalidate the employer's adverse action." See id. at 427 (quoting CSX Transp., Inc. v. McBride, 564 U.S. 685, 692, 131 S. Ct. 2630, 2633 (2011)). However, FRSA liability does not arise "unless the employee can prove that his engaging in a protected activity was a contributing factor to the adverse employment action." Id.

> Under the FRSA, when an employee engages in a protected activity such as reporting a workplace injury, that employee is not insulated from what would otherwise be appropriate discipline for misconduct that becomes known to the employer at that time or during the course of the employer's addressing the protected activity. In simple terms, a protected activity does not by itself shield an employee from the ramifications of workplace misconduct.

Id. Walker claims that his report of a serious safety concern resulting from the alleged shooting and his refusal to continue the shift paired with an alleged bias surrounding the investigation of his report about the incident caused the adverse action against him. Union Pacific denies Walker's allegations and maintains Walker was terminated for his failure to comply with the medical documentation policies.

First, Union Pacific claims that the decision makers involved in his termination had no knowledge of his shooting report or the reasons why he was placed on medical leave. It is Union Pacific's position that Tegeder was responsible for Walker's AWOL status and termination. See Record Document 38-13 at 1. However, the day that Tegeder placed Walker in AWOL status, Tegeder received an email from Chelette stating, "Not sure where the disconnect is but this employee is on medical leave of absence in HP status. Mr. Walker needs to be marked up at once." Record Document 38-8 at 13. Walker spoke to Chelette about the incident three days after it allegedly occurred. See Record Document 43-5 at 86. Additionally, Tegeder testified that his role

13

is triggered by a notice he receives from other members in the organization. See Record Document 43-14 at 21–24. Although Union Pacific maintains Walker was terminated for his failure to comply with the medical documentation policies, the factual record suggests the possibility that Chelette's knowledge of the incident may have played a role in Walker's firing. That possibility creates a genuine dispute as to Chelette's role in Walker's termination, and therefore, summary judgment is improper.

Next, Union Pacific's contends that Walker was terminated just as any other employee who fails to comply with the medical documentation policies would be. See Record Document 38-1 at 17. Union Pacific argues the decision was simply "based upon the data in the system and simple math of whether leave is expired." Record Document 38-1 at 16. Union Pacific contends that Tegeder determined that Walker should be entered into AWOL status based on the number of days Walker was absent without documentation. See id. On March 25, 2022, Reimers provided Walker with instructions and information regarding Union Pacific's reporting requirements for a medical leave of absence. See Record Document 38-8 at 2–7. The instructions clearly indicate that it was Walker's responsibility to submit documentation from his provider to secure medical leave, extend medical leave, or return to work. See id. at 2. However, the email also advised Walker that the failure to provide documentation to extend his medical leave could result in his leave being revoked or going into a show cause process which could lead to an investigation for Walker being considered AWOL. See id. at 4. Tegeder testified that he issued Walker two show cause letters; however, Walker testified that he was never informed that failure to submit documentation could result in termination of his employment without an opportunity to respond. See Record Documents 43-3 at 5 and 43-14 at 8. Based on the language from the emails and the dispute regarding whether

Walker was terminated without an opportunity to respond, Walker has demonstrated a genuine dispute as to whether Walker's termination was standard practice.

At this prima facie stage, Walker's burden is not overly rigorous; the plaintiff is "not required to show that his protected activity was the only reason or that no other factors influenced Union Pacific's decision to terminate him." Taylor v. Union Pac. R.R. Co., Inc., No. 18-1110, 2021 WL 952410, at *8 (M.D. La. Mar. 12, 2021). Walker met his burden to demonstrate that there are genuine disputes of material fact that must be resolved to determine whether his termination was affected "in whole or in part" by his engagement in a protected activity. Moreover, Union Pacific failed to carry its burden to prove by clear and convincing evidence that it would have taken the same unfavorable employment action in the absence of the employee's protected activity.

**2. Extending Walker's Unpaid Leave.**

Walker contends that Union Pacific violated the FRSA by refusing to allow Walker to return to work for several months after reversing its termination of his employment and unilaterally extending his unpaid medical leave of absence from May of 2022 to October of 2022. The parties disagree as to the law being applied. Union Pacific argues that this claim was not administratively exhausted because this claim appears to be brought pursuant to 49 U.S.C. § 20109(c)(2)—which was not alleged in the OSHA complaint. See Record Document 44-4. However, Walker contends Union Pacific's refusal to allow Walker to return to work falls under 49 U.S.C. § 20109(b)(1)(b) and 49 U.S.C. § 20109(a)(4). The Court agrees that a claim under 49 U.S.C. § 20109(c)(2) is not administratively exhausted.[7]

---

[7] The FRSA prohibits a carrier from disciplining an employee for requesting medical or first aid treatment, or for following orders or a treatment plan of a treating physician. See 49 U.S.C. § 20109(c)(2); see also Record Document 43-1 at 28. To pursue a request for relief under the FRSA,

15

In light of this determination, Walker must demonstrate that his protected interest—reporting the incident[8] and refusing to work when confronted by a hazardous safety or security condition related to his duties as a conductor[9]—was a contributing factor to Union Pacific's decision to extend Walker's medical leave past May of 2022. On May 23, 2022, Walker's counselor submitted his medical paperwork to the EAP, resulting in Union Pacific's removal of AWOL status and revocation of his termination. See Record Documents 43-10 at 2 and 43-12 at 4. In Franklin's notes, he estimated Walker's return to work date as "[i]mmediately." Record Document 43-10 at 2. That same day, Walker spoke to Reimers and stated that he wanted to return to work, and Reimers informed him that his return to work depended on the paperwork from his counselor and his ability to be safe at work. See Record Document 43-12 at 4.

Union Pacific contends that it did not discriminate against Walker because it "grant[ed] and continu[ed] a medical leave of absence *in connection with a diagnosed psychological*

---

a plaintiff must first timely "[file] a complaint with the Secretary of Labor." 49 U.S.C. § 20109(d)(1). "[I]n determining whether administrative remedies have been exhausted, this court must interpret the broadness of the FRSA claim, not solely within the scope of the initial administrative charge, but by the scope of the agency investigation that 'reasonably could have been expected to result from the initial charge.'" Johansen v. Illinois Cent. R.R. Co., No. 19-268, 2020 WL 6126160, at *7 (N.D. Miss. Apr. 17, 2020) (quoting Foster v. BNSF Ry. Co., 866 F.3d 962, 966 (8th Cir. 2017)). As noted in Johansen, most cases assume the Title VII standard applies in which "the exhaustion requirement may be satisfied if the civil claim 'grows out of or is like or reasonably related to the substance of the allegations in the administrative charge.'" Id. at *3 n.3 (quoting Foster, 866 F.3d at 966). However, there are differing policy considerations which may indicate a different standard for exhausting a claim is applicable to the FRSA. See id. (noting the policy consideration for Equal Employment Opportunity Commission complaints under Title VII is related to "unlettered lay persons making complaints without legal training or the assistance of counsel.").
In this matter, legal counsel drafted and signed the OSHA complaint on behalf of Walker. See Record Document 44-4. The OSHA complaint explicitly stated that Walker was only making a claim under 49 U.S.C. § 20109(a) and (b). See id. at 5. Moreover, Walker contends that he is only seeking recovery under those sections.
[8] See 49 U.S.C. § 20109(a)(4).
[9] See 49 U.S.C. § 20109(b)(1)(B).

*condition. . . .*" Record Document 44 at 10 (emphasis in original). However, Reimer's email stated that Walker's depended on the paperwork from his counselor and his ability to be safe at work. See Record Document 43-12 at 4. In every progress note provided by Franklin to Reimer, Walker's estimated return to work date was "[i]mmediately." Record Document 43-10 at 2, 4, 6, 9, 13. Neither Walker nor Franklin requested an extension of his medical leave of absence past May of 2022. Walker demonstrated that there is a genuine dispute as to whether the incident played a role in extending his medical leave when his counselor consistently indicated that he could return to work immediately. For these reasons, Union Pacific's motion for summary judgment is **DENIED** to the extent that it seeks dismissal of Walker's FRSA claims.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Union Pacific's motion for summary judgment is **DENIED.**

An order consistent with the instant Memorandum Ruling shall be issued herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 4th day of November, 2024.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE