# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | |
|---|---|
| **NATHAN WALKER** | **CASE NO.  5:23-CV-00740** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **UNION PACIFIC RAILROAD CO** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment [Doc. No. 77] filed by Defendant, Union Pacific Railroad, Co. ("Union Pacific"). Plaintiff, Nathan Walker ("Walker"), filed an Opposition [Doc. No. 79]. Union Pacific then filed a Reply [Doc. No. 80].

For reasons set forth, Union Pacific's Motion is **DENIED IN PART** and **GRANTED IN PART**.

### I.    Background

On March 19, 2022, Walker was working as a conductor in Union Pacific's Hollywood Yard ("the Yard") in Shreveport, Louisiana.[1] While working in the Yard that evening, Walker testified he had stepped off a locomotive and was kneeling down at the derail sign with his head down to take the locks off the derail switch when he heard "gunshots start flying out" in vicinity of his worksite (hereinafter, the "Incident").[2] Walker claims he took cover immediately after hearing the gunshots,

---

[1] [Doc. No. 43-3, p. 2 at ¶ 3].
[2] [Doc. No. 77-3, p. 22 at ¶¶ 17–20; p. 17 at ¶¶ 5–8].

hiding behind a wheel on the right side of the locomotive situated approximately ten yards behind him, placing himself in a position where the train separated him from the road.[3] While Walker admits he could not see the road at the time of the shooting, nor how far away the gunshots were, because he was kneeling at the derail switch sign and immediately took cover behind the wheel after hearing the shots.[4] Walker testified he believes the gunshots came from a car he noticed slowly approaching the Yard right before he heard the gunshots.[5] James Ezernack ("Ezernack"), an engineer for Union Pacific working with Walker on the night of the Incident, testified he also "heard several gunshots that were close by," but couldn't see where they were coming from.[6] Ezernack claims to have ducked his head while sitting in the locomotive because he believed the shots were very close based on how loud they were.[7]

Walker and Ezernack immediately reported the alleged gunshots over the locomotive's radio to the yardmaster, Wayne Haughton ("Haughton").[8] Haughton instructed the two to continue taking the locomotive to the roundhouse and finish their work that night.[9] Walker took the locomotive to the roundhouse and then told Ezernack that he could not handle working anymore and left.[10] Haughton notified Samuel Embras ("Embras"), Senior Manager of Terminal Operations, of the Incident, and Embras later spoke with Walker and Ezernack for almost an hour.[11] Haughton

---

[3] [Id. at p. 20 at ¶¶ 3–17].
[4] [Id. at pp. 20–21].
[5] [Id. at p. 21 at ¶ 11].
[6] [Doc. No. 77-10, p. 6 at ¶¶ 9–10].
[7] [Id. at ¶¶ 12–23].
[8] [Doc. No. 77-3, p. 25 at ¶¶ 3–19].
[9] [Id. at p. 26 at ¶¶ 13–14].
[10] [Id. at ¶¶ 16–19].
[11] [Doc. No. 77-4, p. 9]; [Doc. No. 77-6, p. 8 at ¶¶ 10–11].

filed an incident report that evening through Union Pacific's Response Management Communication Center ("RMCC") Incident Management System.[12] Haughton also notified the local sheriff's department and the Shreveport Police Department.[13]

The next day, Embras and Union Pacific Railroad Police Officer Quincy Bryant ("Officer Bryant") searched the area and did not find shell casings.[14] Officer Bryant and Officer Jack Bartlett of the Union Pacific Railroad Police Department filed a supplemental police report after speaking with Embras and Walker on a conference call.[15] The report detailed Embras' skepticism over Walker's reporting, noting that Embras stated Walker "is known to often try to avoid doing work" and "complained to his coworkers about having to switch a block[.]"[16] The report stated the responding officers were unable to locate the vehicle responsible for firing the shots.[17] Bullet holes were found on the alleged derail switch sign.[18] The locomotive that Walker was near was equipped with a security camera which captured the Incident ("TIR video"). [19] The TIR video shows the locomotive moving forward at 11:29:15 p.m. C.S.T. with Walker approaching the train on the right side carrying a light in his left hand and wearing a reflective vest.[20] Fifteen seconds later, a car passes on the road on the left side of the train.[21] A second car passes on the same road a few seconds later and exits

---

[12] [Doc. No. 77-7, at p. 1].
[13] [Doc. No. 77-6, p. 8 at ¶¶ 7–9].
[14] [Id. at p. 10 ¶¶ 21–25]; [Id. at p. 11 at ¶ 1].
[15] [Doc. No. 77-4, at pp. 1–2, 9].
[16] [Id. at p. 9]
[17] [Id. at p. 1].
[18] [Doc. No. 43-4, p. 10]; [Doc. No. 43-7, p. 2].
[19] [Doc. No. 77-5, p. 1 Exhibit C- TIR Video from Locomotive on Flash Drive].
[20] [Id. at 11:29:15 p.m. C.S.T.].
[21] [Id. at 11:29:30 p.m. C.S.T.].

the frame at 11:30:50 p.m. C.S.T.[22] The TIR video captured a noise of what appears to be three consecutive gunshots coming from a distance.[23] However, the TIR video did not capture a perpetrator or the exact source of the alleged shooting.[24] Immediately after the shooting noise, Walker and Ezernack are heard laughing, with Ezernack exclaiming "Got him!" and Walker saying "Hey, tell Wayne I'm done. F*** that."[25]  The TIR video ends with the train slowly moving to the roadhouse.[26]

As a result of the Incident, and despite Embras' skepticism, Walker was given three days off work.[27] On March 22, 2022, Walker called the Employee Assistance Program ("EAP") seeking medical leave due to anxiety from the Incident.[28] Walker spoke with Tom Reimers ("Reimers"), who approved Walker's request for medical leave of absence ("MLOA"), and set Walker up to see a licensed professional counselor, Jerry Franklin ("Franklin").[29] On March 25, 2022, Reimers emailed Walker and provided him with instructions regarding Union Pacific's reporting requirements for a MLOA.[30] The email sent to Walker stated that it was Walker's responsibility to submit documentation from his provider to secure medical leave, extend medical leave, or return to work. [31] The email further stated, "To secure your initial medical leave (or any length of time for more or less than 30 days), your provider must submit

---

[22] [Id. at 11:29:50 p.m. C.S.T.].
[23] [Id. at 11:29:56 p.m. C.S.T.].
[24] [Id.].
[25] [Id. at 11:31:10 p.m. C.S.T.].
[26] [Id. at 11:31:44 p.m. C.S.T.].
[27] [Doc. No. 43-5, p. 86, ¶¶4–7].
[28] [Doc. No. 38-3, p. 27].
[29] [Id. at pp. 27–29].
[30] [Doc. No. 77-8, pp. 2–7].
[31] [Id. at p. 2].

to EAP the documentation that is listed below."[32] Additionally, the email informed Walker that failure to provide documentation to extend his medical leave could result in his leave being revoked or going into a show cause process.[33] The email explained the show cause process could lead to an investigation for Walker being considered absent without official leave ("AWOL").[34] During this time, Walker reported the Incident to Union Pacific's safety hotline and spoke to Union Pacific's General Chairman, Scott Chelette ("Chelette"), who encouraged him to "keep [his] head up."[35]

After EAP approved Walker's MLOA request, Walker began receiving counseling from Franklin, who diagnosed Walker with post-traumatic stress disorder.[36] On April 11, 2022, Reimers emailed Walker to remind him of his obligation to submit documentation by April 24, 2022.[37] That same day, Walker requested Franklin submit the documentation before the deadline and indicated that he desired to participate in the "borrow out" and move to another service unit.[38] However, Walker injured his arm while moving furniture and asked Franklin to delay submitting the documents until late Sunday, before the deadline.[39] Ultimately, neither Walker nor Franklin timely submitted the required documents, nor did Union Pacific directly request documentation from Franklin.[40] Despite the failure to timely

---

[32] [Doc. No. 77-8, p. 3].
[33] [Id. at p. 4].
[34] [Id.].
[35] [Doc. No. 43-5, p. 86 at ¶¶ 1–3]; [Doc. No. 43-5, p. 88 at ¶ 19].
[36] [Doc. No. 43-3, p. 4, at ¶ 8].
[37] [Doc. No. 77-8, at p. 8 ("Make sure and have your therapist send in documentation that you have been seen twice to secure and extend your medical leave.")].
[38] [Doc. No. 43-11, at p. 2].
[39] [Doc. No. 77-9, at p. 5].
[40] *See* [Doc. No. 43-18, p. 2 at ¶ 5].

file the required documents, EAP granted Walker a grace extension of his MLOA until May 8, 2022.[41] Reimers called Walker on May 9, 2022, to inform him that his MLOA was revoked because no documentation was received by the EAP.[42] Walker understood the consequences of failing to submit documentation and informed Reimers that his provider would send over the documentation after his next appointment on May 11, 2022.[43]

On May 13, 2022, Union Pacific sent a Notice of Revocation for failure to provide documentation to support his need for medical leave.[44] Walker was notified that leave revocations were subject to MAPS discipline policies.[45] On May 16, 2022, Walker received a termination letter from Union Pacific for failure to provide documentation to secure or extend his MLOA.[46] Walker spoke with Chelette after receiving the termination letter, who assured him that he would "talk to a few people."[47] That afternoon, Chelette sent an email to Zac Tegeder ("Tegeder") and others saying Walker needs to be marked up at once for being on MLOA in HP status.[48] Four days later, Chelette sent a follow-up email for an update on Walker's status in the system, explaining that he spoke to Walker who informed him that he sent in his paperwork to return to work.[49] On May 21, 2022, Walker emailed Reimers

---

[41] [Doc. No. 77-12, p. 4].
[42] [Id. at p. 3].
[43] [Id.].
[44] [Doc. No. 77-4, p. 11].
[45] [Id.].
[46] [Doc. No. 77-13, p. 5].
[47] [Doc. No. 43-5, p. 109 at ¶19; p. 110 at ¶ 7].
[48] [Doc. No. 77-8, p. 13]; [Doc. No. 43-5, p. 90 at ¶¶ 13–16] (HP status means the employee is physically unable to work).
[49] [Doc. No. 77-8, p. 13].

an illegible document from Franklin to reinstate MLOA.[50] Reimers responded on May 23, 2022, that the provider documentation was illegible, and Walker responded shortly thereafter that Franklin would send the provider documentation to Reimers.[51] Franklin sent over the provider documentation later that day.[52] Walker spoke with Reimers about his desire to come back to work on the day of his reinstatement on May 23, 2022.[53] Reimers explained that his release depended on Franklin's documentation and Walker's "ability to be safe at work."[54] Roberta Johnson ("Johnson"), Senior Director of Ops Support, replied to Chelette's email that afternoon stating Walker's AWOL would be removed, but that he would be reinstated into HP status because Franklin's documentation did not release him to ready to work status.[55] Walker's MLOA was extended three times: on May 23, 2022, his MLOA was extended until June 23, 2022, on June 20, 2022, his MLOA was extended until August 22, 2022, and on August 15, 2022, his MLOA was extended until October 21, 2022.[56] On October 18, 2022, Walker was released to return to work and ultimately returned to work.[57]

On August 17, 2022, Walker filed a complaint with the Occupational Safety and Health Administration ("OSHA") asserting Union Pacific unlawfully retaliated against Waker for engaging in protected activity under the Federal Railroad Safety

---

[50] [Id. at pp. 11–12].
[51] [Id. at p. 10].
[52] [Doc. No. 77-9, p. 2].
[53] [Doc. No. 43-3, p. 5 at ¶15].
[54] [Doc. No. 77-12, p. 3].
[55] [Doc. No. 77-8, p. 13].
[56] [Doc. No. 77-12, pp. 2–3].
[57] [Id. at p. 2].

Act ("FRSA") 49 U.S.C. § 20109(a) and (b).[58] On March 22, 2023,[59] Walker filed suit, asserting two causes of action.[60] Walker asserts Union Pacific violated the Federal Employer's Liability Act ("FELA") by negligently and carelessly failing to provide him with a reasonably safe place to work which caused and/or contributed to serious mental injuries that he sustained as a result of a shooting on the night of March 19, 2022.[61] Additionally, Walker alleges two separate retaliatory adverse actions under FRSA: (1) Union Pacific terminated Walker's employment soon after he made multiple reports about the gunshot incident and refused to work in the hazardous safety or security conditions at the Yard, and (2) Union Pacific refused to allow Walker to return to work for several months after reversing its termination of his employment and unilaterally extending his unpaid MLOA from May 2022 to October 2022.[62]

On August 18, 2025, Union Pacific filed its second Motion for Summary Judgment.[63] As to Walker's FELA claim, Union Pacific argues Walker's emotional distress claim is not legally and factually cognizable because "the evidence shows no objective immediate risk of physical harm."[64] Likewise, Union Pacific rejects Walker's FRSA claims, denying any nexus between his termination and the Incident arguing

---

[58] [Doc. No. 80-4, p. 2].
[59] As explained in the previous Memorandum Ruling [Doc. No. 45], while Walker received his right to sue letter after filing suit, courts within the Fifth Circuit have held that "receipt of a right-to-sue letter subsequent to the commencement of a Title VII action, but while the action remains pending cures the initial failure to exhaust administrative remedies." *Hilliard v. Par.*, 991 F. Supp. 2d 769, 773 (E.D. La. 2014) (internal quotations omitted).
[60] [Doc. No. 1].
[61] [Id. at p. 6].
[62] [Doc. No. 43-1, pp. 27–28].
[63] *See* [Doc. No. 77].
[64] [Doc. No. 77, p. 14].

that Walker's failure to timely provide Union Pacific with medical paperwork properly led to his discharge and unilaterally extending Walker's MLOA until October 2022 did not constitute an adverse employment action.[65]

The parties have briefed all relevant issues, and the matter is ripe for ruling.

## II.    Law and Analysis

### A.    Summary Judgment Standard

A court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant meets their initial burden of showing no genuine issue of material fact, "the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013) (citation modified). A fact is "material" when proof of its existence or nonexistence would affect the lawsuit's outcome under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "the mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported motion for summary judgement." *Id.* at 247–48. And a dispute about a material fact is "genuine" only if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence

---

[65] [Id. at p. 17]; [Doc. No. 80, p. 10].

of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). But summary judgment is appropriate when the evidence is "merely colorable or is not significantly probative." *Cutting Underwater Tech. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (citation modified).

Moreover, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citation modified). Courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Total E & P USA Inc. v. Kerr–McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (citations omitted).

Finally—and importantly—there can be no genuine dispute as to a material fact when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof of trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## B.    FELA Claim

Union Pacific moves for summary judgment as to Walker's negligence claim under FELA for emotional distress related to hearing off-premises gunshots while working in the Yard.[66] FELA provides the exclusive remedy for a railroad employee whose injury resulted from the negligence of the railroad. *Rivera v. Union Pac. R. R. Co.*, 378 F.3d 502, 507 (5th Cir. 2004). Pursuant to FELA, "[e]very common carrier by

---

[66] [Doc. No. 77-1, p. 10].

railroad…shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier[.]" 45 U.S.C. § 51. To prevail on a FELA claim, "a plaintiff must prove: (1) the defendant is a common carrier by railroad engaged in interstate commerce; (2) he was employed by the defendant with duties advancing such commerce; (3) his injuries were sustained while he was so employed; and (4) his injuries resulted from the defendant's negligence." *Weaver v. Mo. Pac. R. Co.*, 152 F.3d 427, 429 (5th Cir. 1998). Under FELA, a plaintiff's burden of proof has been described as "featherweight," and a plaintiff's FELA claim should be dismissed on summary judgment "only when there is a complete absence of probative facts" supporting the plaintiff's position." *Rivera* 378 F.3d at 506; *Gray v. Ala. Great So. R. Co.*, 960 F.3d 212, 216 (5th Cir. 2020).

Walker seeks to recover for emotional injuries.[67] To recover for an emotional injury under FELA, the Court must apply the zone of danger test. *See Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 555 (1994). Under the two-pronged zone of danger test, a plaintiff must plausibly allege that he faced an "immediate risk of physical harm" by (1) objectively being within a zone of danger and (2) subjectively fearing that his life or person was in danger at the time of the incident. *In re Deepwater Horizon*, 841 F. App'x 675, 678-79 (5th Cir. 2021) (quoting *Rail Corp.*, 512 U.S. at 548). The objective prong requires that "the plaintiff must be in the same location as the accident and face immediate risk of harm to satisfy the zone of danger test." *Id.*

---

[67] [Doc. No. 1, p. 7].

Union Pacific argues the claim should be dismissed because Walker was not objectively in the zone of danger at the time of the Incident, and therefore, Walker cannot recover under FELA for a claim of negligent infliction of emotional distress.[68] To support their argument, Union Pacific contends that Walker was protected by the locomotive at the time of the shooting, there were no vehicles on the road when the gunshots were heard, and Walker cannot place a bullet on the derail as occurring on the night of the Incident.[69] Union Pacific relies on the same Fifth Circuit cases this Court previously distinguished in the first Memorandum Ruling on Union Pacific's Motion for Summary Judgment, *In re Deepwater Horizon* and *Barker*.[70] As previously explained, the facts of the case at hand are distinguishable from both Fifth Circuit precedents. The plaintiffs in *In re Deepwater Horizon* could not satisfy the objective prong of the zone of danger test because the plaintiffs were 100 to 200 feet away from the explosion site and the feeling of deep rumbling sounds in the water was not sufficient to place the plaintiffs "at the site of the accident and subsequent explosions." 841 F. App'x at 679. While the plaintiff in *Barker* was much closer to the site of the accident, standing two feet away from where a pollution pan fell 100 feet from a jack-up drilling rig into the ocean, the Fifth Circuit held the objective prong was not satisfied because the plaintiff was "out of the dangerous position where something could have happened" because he was standing on solid ground and not going to fall. *Barker*, 713 F.3d at 211–12, 224.

---

[68] [Doc. No. 77-1, p. 11].

[69] [Doc. No. 77-1, p. 14].

[70] [Doc. No. 45, pp. 9–10 (citing *In re Deepwater Horizon*, 841 F. App'x 675 (5th Cir. 2021); *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208 (5th Cir. 2013))].

The only new evidence brought by Union Pacific in support of their position in this Motion is testimony from Walker's expert, William Hughes ("Hughes"). Union Pacific argues that because Walker testified he did not hear anything but the locomotive engine and gunshots, combined with Hughes' testimony that he "would expect" Walker to hear the bullet hit the derail sign, this proves Walker was not in the zone of danger because he cannot place any bullets in the Yard or near him.[71] However, the Court agrees with Walker's position in his response to the Motion that Hughes was not retained to serve as an audiology expert. [72] Walker retained Hughes as an expert on industry standards for rail yard operations and security.[73] Hughes' opinion on whether or not Walker would have heard a gunshot does not discredit nor disqualify the testimony from Walker and Ezernack along with photographic and videographic evidence of the Incident. Walker testified he heard gunshots while working in the Yard, and only after the gunshots did he notice the bullet hole in the derail sign.[74] Ezernack testified that he "heard several gunshots that were close by," because of their sound.[75] The derail sign from the Yard shows damage from a bullet.[76] The TIR video footage captures Walker walking outside of the locomotive and a car slowly driving out of frame seconds before the gunshots rang out.[77] All this evidence satisfies the objective prong by placing Walker in the same location as the Incident

---

[71] [Doc. No. 77-3, p. 22 at ¶¶ 10–11]; [Doc. No. 77-14, p. 12 at ¶ 22].
[72] [Doc. No. 79-1, p. 15].
[73] [Doc. No. 53-1, at p. 1].
[74] [Doc. No. 43-3, at p. 3 ¶ 6].
[75] [Doc. No. 77-10, p. 6, at ¶¶ 9, 22–23].
[76] [Doc. No. 43-7, pp. 2–3].
[77] [Doc. No. 77-5, p. 1- Exhibit C- TIR Video from Locomotive on Flash Drive at 11:29:15-30 p.m. C.S.T.].

and facing an immediate risk of harm. *See In re Deepwater Horizon*, 841 F. App'x at 678–79.

After a careful consideration of the record, this Court finds that there is not "a complete absence of probative facts" to support Walker's position. *Rivera*, 378 F.3d at 506; *Gray v. Ala. Great So. R. Co.*, 960 F.3d 212, 216 (5th Cir. 2020). Following the Supreme Court's analysis that "a near miss may be as frightening as a direct hit," the bullet hole in the derail sign was allegedly just above Walker's head at the time of the Incident.[78] *Rail Corp.*, 512 U.S. at 547. If the bullet hole hit the derail sign during the Incident, then Walker was well-within the zone of danger. The combination of testimony from Walker and Ezernack, photographic evidence of bullet holes on the derail sign, and TIR video is enough to satisfy Walker's featherweight burden for summary judgment purposes. For these reasons, Union Pacific's motion for summary judgment is **DENIED** to the extent that it seeks dismissal of Walker's FELA claim.

### C.    FRSA Whistleblower Claim

Union Pacific moves for summary judgment on Walker's retaliation claims under FRSA arguing Walker cannot establish that his  protected activity of reporting the Incident was the contributing factor to the adverse personnel action. Further, Union Pacific argues that Walker would have been terminated anyway for failing to provide medical documentation to secure or extend MLOA.[79] FRSA prevents a railroad carrier from discharging, demoting, suspending, reprimanding, or in any other way discriminating against an employee for engaging in protected activity or

---

[78] [Doc. No. 77-3, p. 23].
[79] [Doc. No. 77-1, p. 15].

refusing to work when confronted by a hazardous condition. 49 U.S.C. § 20109(a), (b)(1). "An action brought to enforce these protections 'shall be governed by the legal burdens of proof set forth in [49 U.S.C. §] 42121(b).'" *Yowell v. Admin. Rev. Bd., United States Dep't of Lab.*, 993 F.3d 418, 421 (5th Cir. 2021) (quoting 49 U.S.C. § 20109(d)(2)(A)(i)). Under the burden-shifting standard, the plaintiff must establish by a preponderance of the evidence: (1) he was involved in a protected activity; (2) the employer was aware that the employee was involved in a protected activity; (3) the employee was subjected to an unfavorable employment action; and (4) the protected activity was a "contributing factor" in the unfavorable employment action. *Id.* at 421–22. A contributing factor is defined by the Fifth Circuit as "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the [employer's] decision." *Id.* at 422. Even a protected activity's *slightest* influence will invalidate the employer's adverse action. *Id.* at 427.

Walker alleges two separate retaliatory adverse actions: (1) Union Pacific terminated Walker's employment soon after Walker reported the Incident and refused to continue working in the hazardous safety or security conditions at the Yard, and (2) Union Pacific refused to allow Walker to return to work for several months after reversing its termination of his employment by unilaterally extending his unpaid MLOA from May 2022 to October 2022.[80] Each will be addressed in turn.

---

[80] [Doc. No. 79-1, p. 26].

1. *Termination of Walker's Employment*

It is undisputed that Walker engaged in a protected activity of reporting the Incident, Union Pacific was aware of the protected activity, and that Union Pacific terminated Walker's employment. The only dispute is whether Walker's protected activity was a contributing factor to his termination. Union Pacific argues that Walker's protected acts were not a contributing factor to Walker's termination and that Walker would have been terminated regardless of his protected acts.[81] Walker conversely argues his protected activities did contribute to his termination.[82]

Union Pacific claims Walker's termination was in accordance with the terms of his collective bargaining agreement which provides automatic termination when an employee is absent without proper leave.[83] Upon granting his medical leave on March 25, 2022, Walker received explicit instruction from EAP advising him multiple times that it is the employee's responsibility to submit provider documentation to "secure, extend Medical Leave, or Return to Work" and failure "to provide documentation to extend your medical leave" could lead to his MLOA being revoked or a show cause process that could end with an AWOL determination.[84] He was instructed the provider documentation must be submitted within 30 days of his leave.[85] This documentation rule was not unique to Walker's situation, but rather standard Union Pacific policy.[86] While Walker attempts to shift the responsibility of

---

[81] [Doc. No. 77-1, pp. 16, 20].
[82] [Doc. No. 79-1, p. 20].
[83] [Doc. No. 77-1, p. 18].
[84] [Doc. No. 77-8, pp. 2, 4].
[85] [Id. at p. 3].
[86] [Doc. No. 77-13, p. 2 at ¶ 8 ("UP medical leave policy makes it the *employee's responsibility* to submit medical documentation within 30 days of the leave.") (emphasis added)].

submitting provider documentation to Union Pacific by presenting emails from Reimers and Franklin discussing another employee, the argument fails because the emails merely show Franklin reached out to Reimers with documentation and Reimers clarified what was needed to adhere to EAP standards.[87] The email reaffirms it is the employee's responsibility to begin the process. Union Pacific's Policy for Managing Agreement Professionals for Success ("MAPS") explicitly states overstaying a leave of absence without authority is subject to dismissal action.[88] Furthermore, the MAPS' FAQs section states an employee can be terminated for being absent without authority or leave, pursuant to the terms and conditions of the employee's controlling collective bargaining agreement.[89] Walker was terminated because he failed to submit supporting medical documentation within 30 days of medical leave.[90]

In the previous memorandum ruling, this Court questioned Chelette's role in Walker's termination for two reasons: Walker confided in Chelette about his reporting of the Incident, and Chelette emailed Tegeder on May 16, 2022, the day of Walker's termination.[91] However, Chelette is not a part of Union Pacific management, he serves as the union representative for the local SMART union, which Walker is a member of.[92] Chelette was copied on Walker's termination letter in his capacity as the union representative.[93] Chelette has no decision making power

---

[87] [Doc. No. 43-15, pp. 2–3].
[88] [Doc. No. 38-11, p. 6].
[89] [Id., at p. 9].
[90] [Doc. No. 77-13, p. 2 at ¶ 8].
[91] [Doc. No. 45, p. 14].
[92] [Doc. No. 43-5, p. 87 at ¶ 14]. The SMART union was previously named UTU [Doc. No. 77-1, p. 19].
[93] [Doc. No. 77-13, p. 5]; [Doc. No. 43-5, p. 109 at ¶¶ 12–22].

regarding employment action taken against Walker, and only communicated with Union Pacific *after* Walker's termination letter was issued to inquire about reinstating Walker.[94] Tegeder, in his capacity as Union Pacific's Manager of Safety and Reporting, controls the process for employees who are absent without proper leave or AWOL.[95] On May 14, 2022, Tegeder received his usual electronic report of employees to be reviewed for potential AWOL.[96] Tegeder reviews the electronic report to see when the medical leave was initiated, and if there is no supporting medical documentation, then he places the employee in AWOL status if the applicable reporting deadline has passed.[97] The process and result is uniform for every employee with an automatic termination provision in their contract: an electronic report of the employees who have overstayed their medical leave are reviewed by Tegeder for potential AWOL status, Tegeder places employees into AWOL status once he confirms the medical leave has indeed been overstayed, and the employee is issued a termination letter if they have an automatic termination provision in his or her collective bargaining agreement.[98] Walker's SMART- TD Texas and Pacific Union collective bargaining agreement has a self-terminate clause that provides for automatic termination of the employee if the employee becomes AWOL after 30 days.[99]

---

[94] [Doc. No. 43-5, p. 109 at ¶¶ 12–25].
[95] [Doc. No. 77-13, p. 1 at ¶ 3].
[96] [Id. at pp. 1–2 at ¶5].
[97] [Id. at p. 2 at ¶ 6].
[98] [Id. at pp. 1–3 at ¶¶ 5–8, 12; p. 6].
[99] [Id. at p. 3 at ¶10].

This process of marking up an employee to AWOL status and issuing a termination letter in accordance with their collective bargaining agreement is carried out wholly separate from, and without consideration of, the reason the employee is on leave.[100] In fact, Tegeder has "no knowledge whatsoever" of the reason any employee is on medical leave.[101] This is consistent with Reimer's email to Walker detailing instructions to secure his MLOA where it states "employee's information is confidential within the EAP program and the company only finds out that their leave is protected or if they are Ready to Work or not."[102]The electronic report identifying potential AWOL employees does not include the reason for an employee's MLOA; it only provides the leave start date, anticipated end date, and the employee's union code.[103]

Walker incorrectly attempts to categorize Courtni Thomas ("Thomas"), who serves as Superintendent of Train Operations for Union Pacific, as having decision-making authority regarding Walker's employment.[104] Walker relies on the holding in *Taylor v. Union Pacific R.R. Co., Inc.* where the court found the decision maker's direct knowledge of the protected activity is not required, but rather it is sufficient for the decision maker to have actual or constructive knowledge. No. 18-1110-SDD-EWD, 2021 WL 952410, at *6 (M.D. La. Mar. 12, 2021). In *Taylor*, Mark Wheeland, the Assistant Vice President of Track Maintenance, was the sole decision maker in

---

[100] [Id. at ¶ 9].
[101] [Id.].
[102] [Doc. No. 77-8, p. 5].
[103] [Doc. No. 77-13, p. 4].
[104] [Doc. No. 79-1, p. 25].

plaintiff's termination and based the decision off information that was provided by Jacob Gilsdorf ("Gilsdorf"), plaintiff's supervisor. *Id.* at *2, *6. Because Gilsdorf had direct knowledge of plaintiff's protected acts and communicated the acts to Wheeland, the *Taylor* court found Wheeland had constructive knowledge. *Id.* at *6.

However, the case at hand is distinguished from *Taylor* because Tegeder did not have direct or constructive knowledge of Walker's protected activity when the termination letter was issued.[105] Walker's Safety Hotline report made on March 28, 2022, lists Thomas as the primary owner and Embras as the secondary owner.[106] Embras handled the report, noting Union Pacific "will add black security fence lining to the fence currently at Hollywood [Yard], add signs, and additional cameras to monit[or]."[107] While the initial interrogatories answered by Union Pacific state Thomas *may* have been involved in the process to remove Walker from the work schedule,[108] Thomas testified she was not involved with Walker's "EAP, medical leave, subsequent AWOL, termination, or return-to-work process.[109] Unlike in *Taylor*, Tegeder did not have direct or constructive knowledge of Walker's protected activity and made the decision to terminate Walker based-off a computer-generated report stating Walker overdue to submit medical documentation and his collective bargaining agreement's self-termination clause.[110] Since Walker has failed to demonstrate Tegeder was aware of his protected activity, Walker cannot establish a

---

[105] [Doc. No. 77-13, p. 3 at ¶ 9].
[106] [Doc. No. 43-16, p. 2]; [Doc. No. 44-1, p. 2 at ¶ 5].
[107] [Id.].
[108] [Doc. No. 43-17, p. 2, at ¶ 1].
[109] [Doc. No. 44-1, p. 2 at ¶ 6].
[110] [Doc. No. 77-13, p. 1 at ¶ 5; p. 2 at ¶¶ 8, 10].

*prima facie* case of retaliation under the FRSA. *See Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014) (finding that a plaintiff failed to satisfy the knowledge element of his FRSA retaliation claim when the decision-makers had no knowledge of his protected activity).

Assuming arguendo that Walker can establish a *prima facie* case of retaliation, the claim still fails because Union Pacific can show by clear and convincing evidence that they would have terminated Walker even in the absence of the protected activity. Union Pacific argues Walker would have been terminated anyway just like any employee who fails to submit the required medical documentation.[111] Walker's reporting of the Incident "does not by itself shield" him from the repercussions of violating his collective bargaining agreement. *Yowell*, 993 F.3d at 427. Walker received clear instructions that it was his responsibility to update Union Pacific with medical documentation to secure or extend his MLOA or return to work.[112] Failure to provide medical documentation prior to the deadline caused Walker to be listed on Tegeder's report for employees to be reviewed for potential AWOL.[113] Once Tegeder verified that Walker had failed to submit the required medical documentation and placed him in AWOL status, the self-terminate provision in his collective bargaining agreement took effect, resulting in his automatic termination after 30 days of being AWOL..[114] The termination clause is consistent with Union Pacific's MAPS that states an employee can be terminated for being absent without authority or leave,

---

[111] [Doc. No. 77-1, p. 22].
[112] [Doc. No. 77-8, pp. 2–5].
[113] [Doc. No. 77-13, p. 2 at ¶ 8].
[114] [Id. at p. 3 at ¶ 10].

pursuant to the terms and conditions of the employee's controlling collective bargaining agreement.[115]  Because Walker's termination letter was administered by Tegeder in accordance with Walker's termination clause in his collective bargaining agreement and without the knowledge of why Walker was taking a MLOA, Walker's reporting of the Incident did not influence his termination.[116]

The Court finds Walker has failed to make a *prima facie* case of retaliation under FRSA by not showing that his reporting of the Incident was a "contributing factor" in his termination. Even if Walker could have established his prima facie case, as analyzed above, Union Pacific provides sufficient evidence that they would have terminated Walker in the absence of a protected activity. As such, Union Pacific's Motion for Summary Judgment regarding Walker's FRSA claim, insofar as it pertains to his termination, is **GRANTED.**

### 2.    *Unilaterally Extending Walker's MLOA*

As stated above, Walker's alleges the reporting of the Incident was a contributing factor to the retaliatory adverse employment action of Union Pacific unilaterally extending Walker's MLOA.[117] Walker argues he suffered an adverse employment action because Union Pacific, after rescinding his termination, refused to allow Walker to return to work for several months by unilaterally extending his unpaid MLOA from May 2023 to October 2023.[118] Union Pacific claims the refusal to permit Walker to return to work constituted discipline and an adverse action under

---

[115] [Doc. No. 38-11, p. 9].
[116] [Doc. No. 77-13, p. 3 at ¶ 9].
[117] [Doc. No. 79-1, p. 21].
[118] [Id. at p. 26].

49 U.S.C. § 20109(c)(2).[119] Walker's OSHA complaint explicitly stated that he was only making a claim under 49 U.S.C. § 20109(a) and (b).[120] This Court ruled in Union Pacific's first motion for summary judgment[121] that a claim under 49 U.S.C. § 20109(c)(2) is not administratively exhausted as it was not alleged in Walker's OSHA complaint.[122] The Court affirms its previous ruling and therefore will not address the merits of Walker's 49 U.S.C. § 20109(c)(2) argument.

Therefore, Walker must demonstrate that his protected interest—reporting the incident[123] and refusing to work when confronted by a hazardous safety or security condition related to his duties as a conductor[124]—was a contributing factor to Union Pacific's decision to extend Walker's medical leave past May of 2022.

Union Pacific rebuts Walker's argument maintaining that "granting and continuing a medical leave of absence *in connection with a diagnosed psychological condition*" does not fall under Section 20109(a) because Union Pacific did not "discharge, demote, suspend, reprimand, or in any other way discriminate."[125] Moreover, Union Pacific argues the unilateral extension of medical leave was not an unfavorable employment action under *Yowell* because Walker avoided any financial hardship because Union Pacific helped him secure, and he received, disability and RRB benefits during the MLOA.[126] 993 F.3d at 421–22. However, Walker explained

---

[119] [Id. at p. 27].
[120] *See* [Doc. No. 80-4, pp. 3–5].
[121] [Doc. No. 45, p. 15].
[122] *See* [Doc. No. 44-4].
[123] *See* 49 U.S.C. § 20109(a)(4).
[124] *See* 49 U.S.C. § 20109(b)(1)(B).
[125] [Doc. No. 80, p. 10].
[126] [Doc. No. 80-2].

in his declaration that despite being on railroad board disability benefits, he "experienced financial hardship while being forced to remain on medical leave and without income."[127] The Court relies on the Administrative Review Board ("ARB") of the United States Department of Labor's ruling in *Fricka v. Nat'l R.R. Passenger Corp.*, where the ARB sought to clarify what qualified as an adverse employment action under FRSA. ARB No. 14-047, 2015 WL 9257754, at *3–4 (ARB Nov. 24, 2015). The *Fricka* decision explained "the FRSA statute and regulations appear to be very broad in their conception of what 'adverse action' is" noting the statute does not limit prohibited employer conduct to changes to employee's compensation or terms of employment, but instead prohibits employers from "discharg[ing], demot[ing], suspend[ing], reprimand[ing], *or in any other way discriminat[ing]*" against an employee for engaging in protected activity. *Id.* at *2 n. 24, *4. While Walker received railroad board disability benefits during his extended MLOA, the Seventh Circuit has ruled that a plaintiff suffered an adverse employment action when he was placed involuntarily on disability leave even though he received "the equivalent of his old salary (through a combination of social security and disability payments) while on disability leave." *Timmons v. General Motors Corp.*, 469 F.3d 1122, 1128 (7th Cir. 2006). The *Timmons* court explained "[m]oney is not the exclusive measure of adverse employment actions" and "significantly diminished material responsibilities… may indicate an adverse employment action." *Id.* While the record in the case at hand does not detail the amount of railroad board benefits, Walker suffered financial hardship

---

[127] [Doc. No. 43-3, p. 6 at ¶ 17].

when he was unable to return to work.[128] Moreover, there is no doubt Walker's material responsibilities were diminished when Union Pacific unilaterally extended his MLOA and continued to hold Walker in HP status.[129] *See id.* at 1128. Thus, Union Pacific unilaterally extending Walker's MLOA from May 2022 to October 2022 qualifies as an adverse employment action.

Moving on the to fourth factor under *Yowell*, the parties disagree whether Walker's protected activity was a contributing factor to unilaterally extending his MLOA. Union Pacific argues that Walker's protected acts were not a contributing factor to Walker's termination and that Walker would have been terminated regardless of his protected acts. Walker conversely argues his protected activities did contribute to his termination. However, Union Pacific fails to explain why they ignored medical documentation listing Walker as ready to return to work as early as May 2022, despite Franklin noting Walker presented an "euthymic affect and optimistic mood" and expressed enthusiasm to get back to work beginning in June 2022.[130]

On May 23, 2022, Walker's counselor, Franklin, submitted his medical paperwork to the EAP, resulting in Union Pacific's removal of AWOL status and revocation of his termination.[131] In Frankin's medical notes, he estimated Walker's return to work date as "[i]mmediately."[132] However, the EAP case report does not note

---

[128] [Doc. No. 43-3, p. 6 at ¶ 17].
[129] [Id.].
[130] [Id. at p. 14].
[131] [Doc. No. 43-10, p. 2]; [Doc. No. 77-12, at p. 3].
[132] [Doc. No. 80-4, p. 11].

Franklin's suggested return to work date in their records.[133] Under the initial MLOA instructions emailed to Walker, it is Reimers responsibility to "report [Walker's] medical leave status to the company.[134] Union Pacific argues in their Reply to Motion for Summary Judgment,[135] the MLOA instructions informed medical providers that the documentation provided to EAP would be "reviewed" meant that UP's Health and Medical Services Department would also have to clear Walker before he could return to work.[136] Union Pacific fails to provide a citation to the guidelines stating UP's Health and Medical Services Department would need to clear Walker. *See Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir. 1992). ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment[.]"). When Walker's AWOL status was removed and he was reinstated into HP status, Johnson explained Walker would not be released to work because Franklin's documentation did not release him to ready to work status.[137] In fact, the EAP Case Report details the only provider note indicating Walker was ready to return to work was received on October 18, 2022.[138] Despite Franklin estimating on every progress note sent to the EAP that Walker's estimated return to work date was immediate, Walker's MLOA was extended by EAP three times.[139] Neither Walker nor Franklin requested an extension of his medical leave of absence past May 2022. The EAP report shows Walker's target return-to-

---

[133] [Doc. No. 77-12, p. 3].
[134] [Doc. No. 77-8, p. 2]
[135] [Doc. No. 80, p. 8].
[136] [Doc. No. 77-8, p. 4].
[137] [Id. at p. 13].
[138] [Doc. No. 77-12, p. 2].
[139] [Doc. No. 43-10, pp. 2, 4, 6, 9, 13]; [Doc. No. 77-12, pp. 2–3].

work date of August 29, 2022, but the date was extended two more months by EAM despite Franklin's provider documentation sent in July recommending Walker's return to work date was immediate.[140] As a result of being placed on unpaid leave between May 2022 and October 2022, Walker suffered financial hardship due to lack of income.[141]

Although Union Pacific maintains Walker's protected activity was not a contributing factor in Union Pacific's decision to delay Walker's return to work, the factual record suggests the possibility that Reimer's knowledge of the Incident may have played a role in the unilateral extension of Walker's MLOA.[142] Reimers knew Walker engaged in protected activity when he spoke to Walker days after the alleged shooting.[143] As it was Reimers' job to report Walker's medical leave status to the company, and Walker could not return to work until his medical leave status released him to work, there is a genuine dispute as to whether the Incident played a role in extending his medical leave when his counselor consistently indicated that he could return to work immediately.[144] For these reasons, Union Pacific's Motion for Summary Judgment is **DENIED** to the extent that it seeks dismissal of Walker's FRSA claim regarding extending Walker's unpaid leave.

---

[140] [Doc. No. 77-12, pp. 2, 4]. The Record does not show whether Franklin's July provider documentation was received and purposely left off Walker's EAP case report or if it was never sent to EAP [Doc. No. 80-4, p. 15].
[141] [Doc. No. 79-1, p. 12].
[142] [Doc. No. 80, p. 8].
[143] [Doc. No. 77-12, p. 5].
[144] [Doc. No. 77-8, p. 2 ("It is [Reimers'] job to report [Walker's] medical leave status to the company.")]; [Id. at p. 13].

### III.    Conclusion

For the reasons stated above,

**IT IS ORDERED** that Union Pacific's Motion for Summary Judgment [Doc. No. 77] is **DENIED IN PART** and **GRANTED IN PART.**

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Union Pacific's Motion regarding Walker's FRSA claim, insofar as it pertains to his termination, is **GRANTED**.

**IT IS FURTHER ORDERED** that Union Pacific's Motion regarding Walker's FRSA claim, insofar as it pertains to Union Pacific's extension of Walker's MLOA, is **DENIED**.

**IT IS FURTHER ORDERED** that to the extent that the Motion seeks dismissal of Walker's FELA claim, the Motion is **DENIED.**

MONROE, LOUISIANA, this 20th of November 2025.

TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE